## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 24-20273-CR-MIDDLEBROOKS/TORRES

UNITED STATES OF AMERICA,

v.

ANDRE RIGBY,

    *Defendant.*
_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

This matter is before the Court on Defendant's motion to suppress physical evidence obtained as a result of an alleged unlawful search (the "Motion"). [D.E. 20]. An evidentiary hearing was held on October 16, 2024. Thereafter, with the Court's leave the parties submitted supplemental briefing. [D.E. 33, 34, 37]. Accordingly, the Motion is now ripe for disposition. Having reviewed the briefing and relevant authorities, and based on the testimony presented at the hearing, the Court recommends that the Motion be GRANTED.[1]

---

[1] This Motion was referred by the Honorable Donald M. Middlebrooks for a hearing pursuant to 28 U.S.C. § 636(b)(1) and the Magistrate Rules of the Local Rules of the Southern District of Florida. [D.E. 24].

## *I. FACTUAL FINDINGS*

The record and evidence presented at the evidentiary hearing provide the bases for the following findings of fact that are material to the issues raised, as well as any findings that may be found in the analysis section of the Report. Defendant Andre Rigby ("Defendant") is charged in a multicount indictment, including one count of possession of a firearm and ammunition by a convicted felon under 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c)(1)(A)(i). [D.E. 3]. Defendant seeks to suppress all physical evidence seized during an August 16, 2023, traffic stop and subsequent arrest, including a firearm and controlled substances, found inside a rented U-Haul van he was driving.

During the evening hours of August 16, 2023, City of Miami Police Officer Stephanie Canizares ("Officer Canizares") patrolled the Liberty Square neighborhood in her vehicle. She and her fellow officers were on patrol as part of a Tactical Robbery Unit, a crime intervention unit looking for violent offenders and carjackers. Officer Canizares testified that while driving westbound on NW 72nd Street she saw a U-Haul van stopped and facing east. When passing the stationary van, she viewed Defendant in the driver's seat apparently not wearing a seatbelt contrary to Florida law. She claimed to have a clear view of the Defendant not wearing his seatbelt. So once officer Canizares passed the van and pulled over to the side of the road,

Defendant began moving and subsequently made a U-turn. Officer Canizares activated her police lights and initiated a traffic stop once Defendant passed her.

Defendant soon thereafter pulled into an apartment inlet housing a dumpster; the inlet abutted a public sidewalk and was marked with tow-away signage. After parking the van, Defendant immediately got out of the driver's seat, closed the door, and locked the vehicle. As he appeared to be walking away from the vehicle, the robbery unit officers in multiple cars surrounded the van.  Officer Canizares exited her car and ordered, with loud verbal commands, the Defendant to stop and return towards her as she felt his actions were suspicious.  She asked for identification, which Defendant claimed not to have on his person, but he then identified himself.

Based on the Defendant's verbal information, she began conducting a records check of the Defendant and the vehicle.  Officer Canizares' Body Worn Camera ("BWC") began recording at approximately 6:18 PM, showing the officer looking at information on her laptop and Defendant standing near the rear of the van. Unprompted, at approximately 6:19 PM, Officer Canizares exited her police vehicle, walked to the van, and attempted to open its locked driver's side door. Another officer contemporaneously attempted the same action.  Naturally, those actions are obviously inconsistent with a traffic stop for a seatbelt offense.  The officers were at that point conducting a criminal investigation of the Defendant and his vehicle.

Defendant then asked the responding officers "what am I being stopped for?"

"No seatbelt," stated Officer Canizares.

"I'm being stopped for no seatbelt?" replied Defendant.

Seconds later, another responding officer, Brandon Manning ("Officer Manning"), interjected "and your license is suspended." Officer Canizares stated nothing in response to Officer Manning's additional comment. Officer Canizares had stated nothing regarding Defendant's suspended license up to that point per the BWC footage. Officer Canizares then demanded the key to the van from the defendant. Specifically, the officer warned Defendant that "I know you have it on you cause I saw you get out of the car."

As Defendant reached into his back pocket, Officer Canizares placed him in handcuffs and removed the key from the same pocket. Officer Canizares immediately walked to the van's driver-side door, unlocked the vehicle, and began searching in its interior. She quickly opened a compartment underneath the van's radio and found a firearm.

"55—Convicto! I knew it, I knew it." she exclaimed. Her hunch and the resulting criminal investigation that followed proved to be correct. Less than five minutes passed between Officer Canizares initially exiting her police vehicle and the discovery of the firearm inside the U-Haul van.

Officer Canizares continued her search of the van and subsequently found a small blue baggie containing marijuana located in the center console and a crossbody bag located behind the driver's seat. After opening the crossbody bag, she then discovered more controlled substances and related paraphernalia: a total of 27.5 grams of marijuana, 22 empty baggies matching that which contained marijuana in

the center console, six small baggies of cocaine totaling .91 grams, and more unused baggies. Defendant's wallet was also found in this crossbody bag.

More than fifteen minutes after completing the search of the van, Officer Canizares and others begin questioning Defendant on whether the renter of the U-Haul could bring the rental agreement in order to drive the U-Haul out of the apartment's dumpster bay.

"[They] can just take [it]," stated another responding officer.

Officer Canizares then filled out a Vehicle Tow and Storage Receipt form but left the section for listing vehicle contents blank. Furthermore, Officer Canizares testified that she never completed an inventory list and instead created a "property report" that only listed the seized physical items to be utilized as evidence in the subsequent criminal investigation and prosecution.

Defendant was arrested. Law enforcement confirmed that the Defendant's driver's license had been suspended in 2016 and cancelled in 2020. Law enforcement also learned that the Defendant is a convicted felon. He was charged with the traffic violation for the unworn seatbelt, driving with a suspended license, possessing a firearm after being a convicted felon, and possession of controlled substances with intent to distribute. The state charges were ultimately dropped and the federal prosecution for the firearms and drug offenses ensued.

## II.     ANALYSIS

### A.     *Legal Framework*

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. A search conducted without a warrant issued upon probable cause is *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The three most recognized exceptions to the warrant requirement are (1) a search incident to a lawful arrest, *see, e.g.*, *New York v. Belton*, 453 U.S. 454 (1981); (2) an inventory search, *see, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364 (1976); and (3) a search permissible under the automobile exception, *see, e.g.*, *United States v. Watts*, 329 F.3d 1282 (11th Cir. 2003).

In this case, the government relies on the second exception as being applicable to the facts of this case. The Government concedes that officers had no probable cause to believe the Defendant was committing firearms or drug offenses while he was driving the vehicle, so the automobile exception cannot apply. Instead, emanating from their "community caretaking functions," police may secure and inventory the contents of an automobile that has been impounded. *Opperman*, 428 U.S. at 368-69. This warrantless inventory search serves "three distinct needs: (1) the protection of the owner's property… (2) the protection of the police against lost or stolen property and (3) the protection of the police from potential danger." *Id.* at 369. Thus, inventory

searches have become a "well-defined to the warrant requirement" and courts have routinely upheld inventory searches if "there was no showing that police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

Stated more simply, a warrantless (i.e. inventory) search of an impounded car is lawful if the police "(1) had the authority to impound the car, and (2) followed department procedures governing inventory searches." *United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021); *see also United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991) (same). "An officer has the authority to impound a car if [the] decision to impound it is in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." *Isaac*, 987 F.3d at 988–89 (quoting *Sammons v. Taylor,* 967 F.2d 1533, 1543 (11th Cir. 1992)) (internal quotations omitted). "The purpose of requiring standard criteria is to 'forbid[] uncanalized discretion to police officers conducting inventory searches.'" *Johnson v. Israel*, 576 F. Supp. 3d. 1231, 1260 (S.D. Fla. 2021) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). "The government carries the burden to show that the requirements of this exception were met." *United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020).

### B.     *The Search of the Vehicle Was Not a Lawful Inventory Search*

The pending motion challenges the warrantless search of the Uhaul van as an unlawful search for evidence without probable cause. The Government insists that Officer Canizares' search of Defendant's vehicle was a simple inventory search, and thus falls outside the scope of the Fourth Amendment's warrant requirement. After

reviewing all the evidence in the case and the legal standards we must apply, the Government's case is unpersuasive. At the time of the search, Officer Canizares lacked the authority to impound the van, as she failed to give, contrary to established department policy, Defendant a reasonable opportunity for a third party to take possession of the vehicle. Furthermore, Officer Canizares entirely failed to follow standard procedures, deviating significantly from City of Miami Police policy regarding inventory searches, both before and after the search.  The Court finds instead that the sole purpose of the officer's unprompted search inside the vehicle was a search for evidence of some crime they suspected this Defendant was engaging in.  The officers's hunch was right; their methods were unlawful. [2]

### 1. *Department Policy Did Not Authorize Impoundment the Van*

Based on the record presented here, Officer Canizares lacked administrative authority to impound Defendant's vehicle at the time of her search.  Circuit precedent holds that the authority to impound an arrestee's vehicle turns on whether the decision to impound was "made in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." *Sammons,* 967 F.2d at 1543 (holding that a genuine dispute of material fact existed for the purposes of a motion for summary judgment regarding the FBI's motive for impoundment as it was

---

[2] We note that there is also a dispute between the parties, discussed in this Motion's briefing and during the evidentiary hearing, regarding whether probable cause to stop the vehicle and then arrest the Defendant for the license violation existed. As the Court finds that the search of Defendant's vehicle was otherwise unlawful, the Court will assume that probable cause to stop the vehicle and then arrest the Defendant under Florida law existed for the disposition of this motion.

unclear whether agents had pretextually detained appellant's wife to deprive him of the opportunity to move his vehicle prior to impoundment) (internal quotation omitted).

Looking first at whether Officer Canizares made the decision to impound Defendant's vehicle based upon standard criteria pursuant to *Sammons*, it is clear she did not. City of Miami Police Department Vehicle Impound Policy 4.4.3.3. states in relevant part:

> If possible, the vehicle should be released to another person or owner who has signed the Election to Leave Vehicle Form, R.F. #228. In either case, the officer making the decision will comply with this section. The "Election to Leave Vehicle" form shall be turned in to the Property Unit. The officer shall, prior to impounding a vehicle, afford the owner or the driver at his or her option, a reasonable opportunity in light of the circumstances in which to provide for the removal of the vehicle within a reasonable length of time…

As evident by Officer Canizares' BWC footage, she did not follow this explicitly-written standard criteria when she made the decision to impound Defendant's vehicle. Immediately after exiting her police vehicle, Officer Canizares attempted to open the door of Defendant's vehicle. She then walked to the Defendant, stated he was pulled over for "no seatbelt," asked him for the van's key, placed him in handcuffs seconds later, retrieved the keys from Defendant's back pocket, unlocked the van, and immediately began searching.[3] Defendant was not even told the van was being impounded, let alone provided any opportunity to provide for the removal of the vehicle—say, by the renter of the van or another authorized third party.

---

[3] The Court notes the incredibly rapid sequence of events that unfolded as visible on the BWC footage.

The officer's actions, undeniable based on the video footage available, fail to follow the standardized criteria that the law requires in order to even begin the process of conducting a lawful inventory search. The Government counters that Office Canizares testified that a common Miami Police Department practice is to tow rental vehicles and then contact the rental company to have a representative take possession of the vehicle from the impound lot. *See United States v. Moss,* 748 F. App'x 257, 259–61 (11th Cir. 2018) (holding that police impounding practices need not be explicitly written to be considered standard criteria). In making this assertion, the Government focuses on the "in light of the circumstances" clause in the Miami Police Department policy because there is, in fact, no express provision of the standardized policy that refers to this rental car procedure at all.

The problem the Government has, however, is that it bears the burden to show *all* requirements of the inventory exception are met. But it only provided the self-interested and uncorroborated testimony of Officer Canizares that there is a unique, unwritten practice for impounding rented vehicles. That is not enough to meet its burden. *See Wilson*, 979 F.3d at 910.

Furthermore, as shown in the provided BWC footage, officers asked Defendant more than 15 minutes after Officer Canizares' initial search if the renter of the vehicle could come and take possession of the U-Haul van—squarely at odds with the contention that there is a standard practice of towing rented vehicles regardless of whether a third party can take possession.

The Government further contends that the fact that Defendant was unable to contact the renter of the U-Haul van to take possession, *well after* Officer Canizares' search was fully conducgted, renders the search lawful under the inevitable discovery doctrine. No supporting holding was provided for this assertion, not surprisingly because it is so unpersuasive where the Government has not proven by a preponderance of the evidence that officers were actively pursuing lawful means of discovery. *See United States v. Johnson*, 811 F. App'x. 564, 571 (11th Cir. 2020) (holding that for the inevitable discovery doctrine to apply, "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct"); *see also United States v. Watkins*, 10 F.4th 1179, 1181 (11th Cir. 2021) (holding that a preponderance rather than "reasonable probability" standard applies to the government when attempting to prove the application of the inevitable discovery doctrine).

Apart from the failure to follow an express standardized policy, the other relevant factors support Defendant's position: whether Officer Canizares held the authority to impound the van at the time of the search, whether she was acting in good faith, and whether her decision to search was not based solely on suspicion of criminal activity. These factors weigh against the legality of the vehicle's seizure when looking at the record. First, BWC footage showing the sheer speed at which the events immediately preceding Officer Canizares' search demonstrates the tangible unlikelihood that the search was executed in good faith. Second, Officer Canizares' exclamation of "55—Convicto! I knew it, I knew it" after discovering the firearm mere

seconds after unlocking the van indicates that Officer Canizares likely searched the van *solely* on suspicion of finding evidence of criminal activity as opposed to a lawful impoundment of the vehicle.

While the government accurately cites to *United States v. Staller* for the proposition that "if an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found," Officer Canizares' inventory search was never "otherwise reasonable" here based on the circumstances. Approximately one minute passes between Officer Canizares first attempting to open the U-Haul door and then successfully doing so after arresting Defendant and obtaining the key. Once again, Defendant was never given a reasonable opportunity to contact a third party who held the authority to move the U-Haul from its parked location. Although the Government argues that the U-Haul would have eventually been towed "in light of the circumstances"—as it was parked in front of a dumpster in an inlet with tow away signage—Officer Canizares could not have reasonably determined this when making the decision to impound and search the van.[4] *See United States v. Handy*, 592 F. App'x 893, 907 (11th Cir. 2015) ("a police officer's decision to impound a car may involve discretion but must be made

---

[4] Compare Officer Canizares' split-second decision to impound the U-Haul and immediately search it with the conduct of the enforcement in *United States v. Isaac*, 987 F. 3d 980, 990 (11th Cir. 2021) (determining the decision to impound defendant's vehicle to be reasonable when the "[d]epartment [was] small… it was short staffed that night, and that one of the other officers on the scene had to leave" and that the governing police department policy contemplated impoundments being allowable "due to time or staffing constraint.").

according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity").

In sum, the Government's effort to validate this warrantless search fails at the first hurdle because it has failed to show that the decision to impound the vehicle in the first place was based in good faith application of standardized department policy. The decision to impound the vehicle here was a byproduct of a warrantless search of the vehicle in an effort to find incriminating evidence, which fully undermines the claim that a valid inventory search took place.

### 2. *Department Policy Was Also Not Followed in Conducting the Search*

Notwithstanding Officer Canizares' lack of authority to impound Defendant's vehicle, we proceed with the analysis and consider, even if she had, whether the resulting search itself was a valid inventory search. It too was not. The officer did not follow clearly stated City of Miami Police Department policy regarding inventory searches. The failure to do so is fatal for purposes of justifying a warrantless search.

As a foundational matter, department impoundment policy reads in pertinent part that "all field units, uniform and plainclothes… are responsible for knowing and following procedures set forth in this chapter." While somewhat circular, as the preceding section already addresses this aspect, Officer Canizares' pre-search conduct deviated significantly from department policy. The applicable section states in pertinent part that:

> The officer shall, prior to impounding a vehicle, afford the owner or the driver at his or her option, a reasonable opportunity in light of the circumstances in which to provide for the removal of the vehicle within a reasonable length of time.

The Court finds that Officer Canizares never afforded Defendant, the driver, the reasonable opportunity to provide for the removal of the U-Haul. BWC footage shows that mere seconds passed between Defendant's arrest and Officer Canizares using the obtained key to unlock and search the vehicle. Moreover, responding officers only gave Defendant an opportunity to release the vehicle to another person (i.e. the renter of the U-Haul) approximately 15 minutes *after* Officer Canizares began her search. BWC footage shows Officer Canizares and another officer explicitly requesting Defendant to contact the U-Haul's authorized renter so they "can just take [the U-Haul]."

Following her search for evidence, Officer Canizares continued to deviate from standard procedures. Department policy states in relevant part that:

> [T]he impounding officer shall: ensure that that the vehicle is *completely inventoried* at the scene of the impoundment… [that] [w]henever possible, the inventory should be conducted in the presence of another police officer, who shall also sign the vehicle storage receipt… [and that] [t]he vehicle storage receipt shall list all items whether they remain in the vehicle or they are placed in the Property Unit.

Here too the Court finds that Officer Canizares failed to follow the above department policy and standard procedures. She never completed an inventory list—instead generating a so-called "property report"—and furthermore did not complete the requisite "Vehicle Contents" section of the vehicle storage receipt.

Given these multiple failings, Officer Canizares' failure to adequately follow department policy rendered the inventory search unlawful. *See, e.g., Wells*, 495 U.S. at 4-5 (affirming the suppression of evidence seized from a suitcase opened during an inventory search proper, absent department policy allowing for the secondary search,

as it "was not sufficiently regulated to satisfy the Fourth Amendment"); *Sammons*, 967 F.2d at 1544 (denying officers' qualified immunity claim where a dispute of material fact existed as to whether the officers followed standard procedures when executing an inventory search); *Johnson v. Israel*, 576 F. Supp. 3d. at 1260-61 (denying officers' qualified immunity claim after "conduct[ing] an inventory search without following—so far as we can tell—*any* standard police procedures").

Undeterred, the Government posits the counterargument that under *United States v. O'Bryant*, Officer Canizares' "technical" failures to follow department policy, focusing on the failure to complete a proper inventory list, should not invalidate the search in its entirety. 775 F. 2d 1528, 1534 (11th Cir. 1985) ("reject[ing] O'Bryant's contention that the inventory search exception to the general prohibition against warrantless searches was violated because Crespi did not prepare a complete list of the briefcase's contents"). Yet, *O'Bryant* was expressly contemplating the inventory search of an abandoned briefcase located next to a dumpster and made specific note that "[t]he reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Id.* at 1529, 1534 (quoting *United States v. Jacobson*, 466 U.S. 109, 115 (1984)) (internal quotations omitted). Thus, the Government's caselaw cited for the proposition that technical failures to follow standard procedures have no effect on the legality of an inventory search is nonapplicable to the matter at hand. *See also United*

*States v. Moncur*, 2011 WL 3844096 at *9 (S.D. Fla. 2011) (distinguishing *O'Bryant*'s holding from the contemplated matter: an inventory search of defendant's car).[5]

In all, Officer Canizares' failure to follow standard procedures as set forth in the City of Miami Police Department policy further renders the inventory search unlawful. *See Wells*, 495 U.S. at 8 (Brennan, J., concurring) ("Our cases clearly hold that an inventory search is reasonable under the Fourth Amendment only if it is done in accordance with standard procedures that *limit* the discretion of the police").

Finally, even if we could look past all these failings, which are not merely technical and instead go to the heart of the inventory search exception, the Court also finds that the Government's ultimate burden has not been met. The key to a valid inventory search is that the search was merely an administrative measure designed to protect the owner's property while in policy custody and to guard the police from danger. *Wells*, 495 U.S. at 4 (quoting *Colorado v. Bertine,* 479 U.S. at 372). If, instead, the search was not a good faith effort at complying with administrative procedures then the search is not lawful. It is, in other words, the product of a bad faith police practice designed to be a "ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must *not* be allowed so much latitude that inventory searches are turned into 'a purposeful and

---

[5] Furthermore, the only other caselaw the Government cites to in support of this argument is not binding on this Court.

general means of discovering evidence of crime[.]'" *Id.* (quoting *Bertine,* 479 U.S. at 376)).

The record supports this finding of bad faith in multiple respects. First, the officer's testimony that she was merely following policy was simply not credible. The officer's version of events was quite tortured. Her attempt to justify in after-the-fact fashion why she did not follow policy was simply not believable. Second, the body cam footage persuasively shows why the officer was so conflicted. She is shown clearly engaging in a full-fledged search for incriminating evidence based on her hunch well before the concept of an inventory search ever crossed her mind. Any objective view of the camera footage reveals that she was indeed rummaging for evidence in a purposeful attempt to find evidence of the suspect's criminal activity. Faced with this telling video evidence, the Court cannot simply ignore it because the community may be better off with this defendant facing jail time for his crimes.

We close by noting that it is understandable that officers in the line of very difficult and stressful duty rely on hunches in order to find criminals. The officer's good faith in helping her community is commendable. But an officer does not operate in a vacuum; unlike criminals, law enforcement officers are handcuffed by constitutional limitations. *See, e.g., United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003) (affirming suppression where a "hunch" led officers to initiate a new investigation of other criminal activity after the purpose of the traffic stop had ended. "Thus, the continued detention of Perkins and Scott beyond the issuance of the traffic citation, during which Colston repeatedly asked if there were drugs in the car and

called in a drug dog, was unlawful. . . . Finally, we emphasize that "the fact that [Colston's] hunch ultimately turned out to be correct—*i.e.* that [Perkins and Scott] *were* illegally transporting [drugs] is irrelevant for purposes of the Fourth Amendment. *To hold otherwise would open the door to patently illegal searches by government officials, who would attempt to justify the legality of their conduct after-the-fact.*") (emphasis added).

In this case, the officers conducted a search of a vehicle without probable cause based on a hunch that this individual was engaging in some form of criminal behavior. That search, however, was unlawful under established Supreme Court precedent, and their after-the-fact effort to justify the search under the inventory search exception simply fails because they cannot satisfy any of the essential elements of the exception.

## III. CONCLUSION

Based upon a thorough review of the record as a whole and the credible evidence admitted at the evidentiary hearing, the undersigned **RECOMMENDS** that Defendant Andre Rigby's Motion to Suppress be GRANTED. [D.E. 20]. Evidence seized pursuant to the officers' search of the vehicle for incriminating evidence should be suppressed.

Written objections to this Report and Recommendation, if any, shall be expeditiously filed. Given the fact that this case is set for trial starting the week of November 18, 2024, the Court will expedite the period for filing objections as per S.D. Fla. Local Mag. J. R. 4(b). Any objections must be filed by **November 8, 2024**. Failure

to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

    **DONE AND SUBMITTED** at Miami, Florida, this 4th day of November, 2024.

 

_____
EDWIN G. TORRES
United States Magistrate Judge